WELKER v. WELLER et al.

(Circuit Court, W. D. Pennsylvania. February 13, 1896.)

1. PATENTS—INFRINGEMENT—FASTENINGS FOR TABLE LEGS.
The Welker patent, No. 480,536, for a fastening for table legs of knockdown tables, cannot, in view of the prior state of the art, be expanded to cover constructions which do not embody the elements of "longitudinal, segmental kerfs," and "tenons secured in the grooves or kerfs," and in which the joint used is of a different and well-known construction.

2. SAME—DESIGN FOR TABLE LEGS.
The Welker design patent, No. 22,997, for a design for table legs, is void for want of novelty.

This was a suit in equity for the infringement of certain patents relating to table legs for knockdown tables.

John G. Reading and Frank L. Dyer, for complainant.

S. P. McCandless, H. C. Parsons, and C. D. & W. R. Davis, for respondents.

BUFFINGTON, District Judge. This suit is brought by Louis Welker against H. M. Weller and William Decker for alleged infringement of letters patent No. 480,536, granted August 9, 1892, for a fastening for table legs, and also for the infringement of letters patent for a design for a table leg, No. 22,997, granted January 2, 1894, to said Welker. As touching the first patent, infringement of the third claim is alleged, which is as follows:

(3) In a knockdown table, the combination of the frame, having its side pieces provided with the longitudinal, segmental kerfs or grooves, arranged as described, the corner piece or brace having its chamfered ends provided with the tenons secured in the grooves or kerfs, the solid head leg fitted against the imperforate ends of the side pieces, and the screw bolt secured in the head of the leg, and having a nut bearing against the corner piece or brace, substantially as described.

The defenses alleged are noninfringement, prior use, and lack of patentability. The subject of dispute is what is known in the furniture trade as a "knockdown table." For convenience of shipping and handling, tables are constructed with adjustable legs placed therein, and the whole crated and shipped. The legs are not attached until they reach the dealer. In this way freight is saved, and damage to the tables avoided, while the adjustable legs make it possible to use such tables in flats and houses with narrow halls, into which the same table, with nonadjustable legs, could not be carried. Decided advance in the art had been made before Welker's patent. It is not necessary to refer to all of it in detail. The examples selected are sufficient to show the comparatively narrow field for advance left when Welker entered the field. Prior thereto, we find in knockdown tables a corner brace connecting the side rails,

and connection of these parts made with an adjustable leg by a wood screw, which passed through a hole in the corner brace, and was screwed into the leg or by a lag screw which had a nut head, instead of the flat screw head of the wood screw. The objection to this method was that when the table was taken apart the screw had to be taken completely out of the leg, and when this was done a few times the hole became enlarged, and the tables ceased to be rigid and firm. This objection was in part obviated by the St. John construction, in which an opening of keyhole shape was made in the cross brace of sufficient size at the lower end to permit the nut of the lag screw to slip through. When this was done the leg was pushed upward to its proper place, and a rigid connection made by turning the nut. By this method the screw was only given a few turns, and it was not necessary to remove it entirely from the table leg. The next advance showed a method in which there was no abrasion of the leg whatever. In it the interior corner of the leg was slotted so as to permit an iron hook to slip down and engage with an iron cross-piece in the slot. The outer end of the hook was threaded, passed through a hole in the corner brace, and by means of a nut with washer the parts were drawn into rigid connection, the ends of the rails seating themselves in bevels on the sides of the legs. This method was embodied in Goedeke's patent, No: 456,377, of July 21, 1891. Subsequent to this, complainant conceived the idea of permanently placing a rigidly connecting hanger bolt in the leg itself, and also of attaching the corner brace to the side rails by a peculiar form of joint. A hanger bolt has a wood screw thread at one end, and a nut thread at the other. It will be noted that the idea of threading the exterior end of the connecting bolt, and forming a rigid connection by a nut, was not original with complainant, and his advance in this respect was simply in making the connecting pin primarily rigid, as opposed to Goedeke's attaching a hooked bolt to a cross pin in the leg slot. The third claim originally made was:

In a table, the combination with side pieces, a corner block, and a leg, of a screw bolt rigid with the leg, and passing through the corner piece, and a nut fitted on the screw bolt, substantially as described.

This claim, which was clearly broad enough to cover defendants' device, was rejected on the Goedeke patent, and because the lag screw was common in furniture; and in the subsequent proceedings the applicant, in effect, disclaimed originality in the lag screw itself, saying:

Applicant regards it as important to use a bolt having a lag screw at one end to rigidly fasten the bolt in a solid leg, and with a metal-nut thread on its other end. The bolt is not claimed, per se, but the organization of the several parts is new.

In all the claims finally granted, there was a limitation of longitudinal, segmental kerfs, and tenons secured in the kerfs or grooves. In view of these proceedings in the patent office, and of the prior advance in the art, it is manifest the claim should not be expanded to cover constructions which do not embody the elements of "longitudinal, segmental kerfs," and "tenons secured in the grooves or kerfs," and in which the joint employed was another and well-known

prior form of construction. Indeed, such a construction would be fatal to the patent. The claim being thus construed, it is clear the respondents' device does not infringe.

The question still remains, can the bill be sustained upon the design patent for a table leg? On November 29, 1893, the complainant applied for a design patent for a table leg, which was granted January 2, 1894. "The leading feature in my design," the specification recites, "consists of a table leg with an upper end of a generally square shape, with one of its corners beveled off, and with a projection protruding from the beveled corner." He had on December 2, 1891, applied for a mechanical patent for a fastening for table legs, which, in substance, showed in combination the form of leg embodied in the design patent. The complainant testifies that he made his invention in the latter part of the summer of 1891, and began manufacturing the tables in the fall, or the latter part of the summer, of 1891. Conceding for present purposes that a table leg which had been embodied in combination in a mechanical patent issued before the present application was made, which is not in itself an article of commerce, and which, when used in a table, so far as the "projection protruding from the beveled corner" is concerned, is wholly hidden from view, and in no way appeals to the eye; conceding, we say, that it can be the subject of a design patent, and conceding that a design patent could issue on an application made November 29, 1893, for a design which, by the applicant's admission, had been perfected more than two years previously, and had been publicly used and manufactured in the fall or latter part of the summer of 1891,—the question still remains whether there was any novelty in the design shown. On this point the issue is with the respondents. Exhibit G, introduced by complainant, and admitted by him to have been manufactured by respondents before the device in suit, shows a table leg with an upper end of a generally square shape, with one of its corners beveled, and a projection protruding from such beveled corner. The only difference between it and the design-patent device is that Exhibit G has a fixed nut on the end of the projection. Such being the case, there certainly was no patentable novelty in dispensing with the nut. Where the two designs are, in their prominent features, identical, as they are here, and their sole difference lies in that the protuberance of one has a small nut at the end, and the other has none, the difference is not of such material character as to afford ground for the grant of a design patent. We are therefore of opinion the design patent is void for want of patentable novelty. Let a decree dismissing the bill be drawn.